**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| HUNT CONSTRUCTION GROUP, INC., | ) |
| | ) |
| Plaintiff and Counter-Defendant, | ) |
| | ) |
| v. | )   Civil Action No.  05-165  (RMC) |
| | ) |
| NATIONAL WRECKING | ) |
| CORPORATION, *et al.*, | ) |
| | ) |
| | ) |
| Defendants. | ) |
| | ) |

<u>**MEMORANDUM OPINION**</u>

Hunt Construction Group, Inc. ("Hunt") and National Wrecking Corporation ("NWC") entered into a construction subcontract whereby NWC agreed to provide certain excavation services at a project located in downtown Washington, D.C.  The United States Surety Company ("USSC") and XL Reinsurance America, Inc. ("XL") (collectively the "Sureties") provided a performance bond with Hunt as the obligee and NWC as the principal/obligor.  NWC allegedly caused delays in the project, so that, months after it had completed its work, Hunt "terminated" its subcontract with NWC and then sought to hold the Sureties liable under the performance bond for costs and expenses allegedly caused by NWC's tardy performance.  This litigation ensued and the Sureties now ask for summary judgment.

**I**.  **BACKGROUND FACTS**

NWC agreed to a subcontract ("Subcontract") with Hunt on or about October 6, 2003, to perform excavation and certain other work on the construction of an Embassy Suites Hotel in D.C. (the "Project").  NWC began the work in the same month and completed the mass excavation on

April 6, 2004.  Hunt alleges that NWC was required to complete the mass excavation no later than February 12, 2004.  Hunt contends that NWC never properly staffed the Project and, from the beginning, failed to keep pace with the construction schedule.  In an effort to keep on schedule, Hunt accelerated the performance of Rapid Response Construction, Inc. ("Rapid") when it first started concrete work on the footings on January 22, 2004, and kept the accelerated pace in place all the way through to the top of the building.  According to Hunt, it incurred costs of $803,264 due to late mass excavation work by NWC.

Although the Subcontract called for NWC to give Hunt a "detailed plan and schedule for performing and coordinating its Work" within five days of signing the subcontract,  Sureties' Mem. Ex. 1 § 9.3, NWC did not actually submit a schedule until sometime in December 2003.  That schedule indicated that NWC would complete the mass excavation by February 25, 2004.  Hunt says that it did not realize that there would be a substantial delay until early February 2004, when it confronted NWC.  On February 5 and 6, 2004, Mr. Page, Hunt's Project Manager, sent letters to NWC complaining about the delay and warning that NWC might be liable for Hunt's increased costs.

On July 13, 2004, more than three months after NWC completed the mass excavation work for the Project and was no longer on site, Hunt sent NWC a letter captioned "Default Notice," indicating that it constituted "formal notice that National Wrecking Corporation is in default of its subcontract with Hunt Construction Group" ("the NWC Default Notice").  *See* Sureties' Mem. Ex. 6.  The NWC Default Notice stated, in part:

> National Wrecking's refusal to perform its subcontract obligation to perform the Work promptly and diligently, its failure to meet the Project Schedule, and its causing of delay

> to Hunt constitute material breach of the subcontract terms. During the Project, National Wrecking consistently failed to supply sufficient labor and supervision. National Wrecking also failed to perform its Work promptly and diligently, and to meet the Project Schedule. This resulted – and continues to result – in delay and interference with the work of other trades.
>
> Therefore, Hunt declares National Wrecking in default pursuant to Section 30.1 of the subcontract. This letter is to provide National Wrecking with three days notice that it intends to exercise the remedies for default provided in subcontract sections 30.[1](2), 30.1(3), 30.1(4), 30.1(5) and the other Subcontract provisions providing rights and remedies to Hunt.

*Id.*   On that same day, Hunt also wrote to the sureties to give "formal notice" that NWC was declared to be in default ("USSC Notice of Default"). In part the USSC Notice of Default informed the Sureties:

> Among other breaches, National Wrecking Corporation has refused to perform its work and has delayed the project.
>
> Hunt hereby demands that United States Surety Company and XL Reinsurance America, Inc. arrange for performance of National Wrecking's obligations under the subcontract. Hunt looks to United States Surety Company and XL Reinsurance America, Inc. to remedy National Wrecking's failures to perform.

Sureties' Mem. Ex. 7. Of course, as Hunt acknowledges, the Sureties could not arrange for the performance of NWC's mass excavation work because the USSC Notice of Default was sent *after* NWC had completed the excavation. Sureties' Mem. Ex. 3, Deposition of Robert Decker ("Decker Dep.") at 145-147.[1]

        The Sureties immediately engaged Robert Beers of Beers Construction Consultants,

---

[1]  Mr. Decker testified as the corporate representative for Hunt. *Id.*, Decker Dep. at 9.

Inc., to investigate Hunt's claim.  However, Mr. Beers had a very hard time getting Tom Page, Hunt's project manager and the ostensible author of the default notices, to respond to his calls and messages.  When they finally did talk, on July 21, 2004, Mr. Page refused to speak to Mr. Beers without advice of Hunt's lawyers.  The Sureties wrote to Mr. Page on August 10, 2004, seeking information but Mr. Page did not respond.  On August 17, 2004, the Sureties sent a Status Inquiry to Mr. Page, asking about the progress of NWC's work.  Mr. Page did not respond.

After months of silence, Hunt sent a "Notice of Termination" to NWC and copied the Sureties on October 14, 2004.  The Sureties again asked Mr. Beers to investigate, Mr. Beers again attempted to contact Mr. Page (who had signed the Notice of Termination), and Hunt again failed to respond.  The Sureties wrote to Hunt on November 30, 2004, asking that Hunt and Mr. Page cooperate with Mr. Beers's investigation and provide requested information immediately.  Hunt did not respond.

However, Hunt did initiate this suit against NWC on January 25, 2005.  Hunt added the Sureties as defendants on October 5, 2006, when it filed its Second Amended Complaint.  Hunt alleges that the Sureties breached their bond obligations and owe it more than $800,000.

## II. LEGAL STANDARDS

### A.    Jurisdiction and Venue

Plaintiff rests jurisdiction on the diversity of the parties and the amount in dispute.  *See* 28 U.S.C. § 1332(a)(2).  Am. Compl. ¶ 9.  Jurisdiction is determined based on the facts as they existed at the time the case was filed.  *Grupo Dataflux v. Atlas Global Group, L.P.*, 541 U.S. 567, 570-71 (2004).  A court lacks diversity jurisdiction if there are litigants from the same state on opposing sides of the controversy.  28 U.S.C. § 1332(a)(1); *see Prakash v. Am. Univ.*, 727 F.2d 1174,

1178 n.25 (D.C. Cir. 1984).  A corporation is deemed to be a citizen of the state in which it is incorporated *and* the state where it maintains its principal place of business. 28 U.S.C. § 1332(c)(1). The principal place of business for a corporation is usually its headquarters, where day-to-day business is conducted.  *Masterson-Cook v. Criss Bros. Iron Works, Inc.*, 722 F. Supp. 810, 812 (D.D.C. 1989). The Court has jurisdiction over this matter, because the matter in controversy exceeds the sum or value of $75,000, exclusive of interests and costs, and is between citizens of different States. Further, the Court has personal jurisdiction over each of the parties because they are U.S. corporations doing business in the District of Columbia.  Venue is also proper in this Court. A plaintiff can bring an action in (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which any defendant may be found, if there is no district in which the action may otherwise be brought.  28 U.S.C. § 1391(b).  Venue is properly placed in the District of Columbia because the Defendants do business in the District of Columbia and the Project is located in the District of Columbia.

### B.        Summary Judgment

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment must be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56 (c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322

(1986); *Diamond v. Atwood*, 43 F.3d 1538, 1540 (D.C. Cir. 1995). Moreover, summary judgment is properly granted against a party that "after adequate time for discovery and upon motion . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. To determine which facts are "material," a court must look to the substantive law on which each claim rests. *Anderson*, 477 U.S. at 248 (1986). A "genuine issue" is one whose resolution could establish an element of a claim or defense and, therefore, affect the outcome of the action. *Celotex*, 477 U.S. at 322; *Anderson*, 477 U.S. at 248.

In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. *Anderson*, 477 U.S. at 255. A nonmoving party, however, must establish more than "the mere existence of a scintilla of evidence" in support of its position. *Id.* at 252. To prevail on a motion for summary judgment, the moving party must show that the nonmoving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. By pointing to the absence of evidence proffered by the nonmoving party, a moving party may succeed on summary judgment. *Id.* In addition, the nonmoving party may not rely solely on allegations or conclusory statements. *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999); *Harding v. Gray*, 9 F.3d 150, 154 (D.C. Cir. 1993). Rather, the nonmoving party must present specific facts that would enable a reasonable jury to find in its favor. *Greene*, 164 F.3d at 675. If the evidence "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted). When contract terms are not ambiguous, resolution of dispute relating to a

contract may be properly accomplished by summary judgment. *Nat'l Shopmen Pension Fund v. Burtman Iron Works, Inc.*, 148 F. Supp. 2d 60 (D.D.C. 2001).

### III.  ANALYSIS

The question of the moment is not whether NWC delayed the Project but whether Hunt timely notified the Sureties that Hunt believed NWC was in default and it was up to the Sureties to step in under the performance bond.  District of Columbia law is well established that a surety's obligations are measured by the conditions stated in the bond.  *Goldberg, Marchesano, Kohlmand, Inc. v. Old Republic Sur. Co.*, 727 A.2d 858 (D.C. 1999).  In other words, "the liability of the surety cannot be extended beyond the terms of the surety contract." *In re Estate of Dickenson*, 736 A.2d 1007, 1010 (D.C. 1999).  "Nothing can be clearer, both upon principle and authority, than the doctrine, that the liability of a surety is not to extend, by implication, beyond the terms of the contract.  To the extent, and in the manner, and under the circumstances, pointed out in his obligation, he is bound, and no farther." *Miller v. Stewart*, 22 U.S. (9 Wheat) 680, 702-203 (1824); *see also Bevard v. New Amsterdam Cas. Co.*, 132 A.2d 157, 159 (D.C. 1957) ("A surety's obligation must be measured by the condition stated in the bond and . . . such condition cannot be construed to go further than its terms and give rights to others not mentioned either expressly or by intendment.").  But, "there is a rule of construction which holds that when the language of the contract is ambiguous and the surety is a company, the surety bond should be construed liberally in favor of the beneficiary." *Goldberg*, 727 A.2d at 861 n.1.

Turning to the Performance Bond, we find the following terms:

> Whenever Principal [NWC] shall be, and be declared by Obligee [Hunt] to be in default under the subcontract, the Obligee having performed     Obligee's obligations

thereunder:

> (1) Surety may promptly remedy the default subject to the provisions of paragraph 3 herein, or;
>
> (2) Obligee after reasonable notice to Surety may, or Surety upon demand of Obligee, may arrange for the performance of Principal's obligation under the subcontract subject to the provisions of paragraph 3 herein;
>
> (3) The balance of the subcontract price, as defined below, shall be credited against the reasonable costs of completing performance of the subcontract . . .

Sureties' Mem. Ex. 2.  Notably, Hunt proposed this language in a form performance bond; the Sureties did not draft it.  Sureties' Mem., Declaration of Richard E. Klein ("Klein Decl.") ¶ 4.  The Sureties interpret the Performance Bond to trigger their obligations only after NWC was in default and Hunt had declared NWC in default.  Thereafter, they assert, there would be two options.  First, the Sureties could remedy NWC's default.  Second, Hunt after reasonable notice or upon demand upon the Sureties, could arrange for the performance of NWC's work under the subcontract.  However, Hunt waited and did not declare a default until the alleged default could no longer be remedied; the Sureties contend that Hunt breached the performance bond and rendered it null and void because Hunt deprived them of their right to protect themselves under the terms of the performance bond.

The Sureties cite case law that supports their interpretation.  As the District Court in Wyoming put it, "Courts have consistently held that an obligee's action that deprives a surety of its ability to protect itself pursuant to performance options granted under a performance bond constitutes a material breach, which renders the bond null and void."  *St. Paul Fire & Marine Ins.*

*Co. v. City of Green River, Wyoming*, 93 F. Supp. 2d 1170, 1178 (D. Wy. 2000). *Elm Haven Constr. Ltd. P'ship v. Neri Constr. L.L.C.*, 281 F. Supp. 2d 406 (D. Conn. 2003), involved a dispute under the identical language of the performance bond here. In *Elm Haven*, the general contractor sent letters to the subcontractor and its performance-bond surety regarding its displeasure with the subcontractor's performance. Receiving no response from the surety, the general contractor began to supplement and complete the subcontractors performance. *Elm Haven*, 281 F. Supp. 2d at 410-11. After completing the subcontractor's work, the general contractor claimed its value from the surety. Upon reviewing the letters from the general contractor to the subcontractor, the court found that only the last letter was a clear and unequivocal declaration of default that triggered the bond obligations. *Id.* at 414. However, the default notice was sent after the general contractor had hired a replacement subcontractor. The court granted summary judgment to the surety because, "[b]y the time that letter had been sent to [the surety], however, general contractor had already contracted with [another subcontractor], which precluded [the surety] from exercising its options under the performance bond." *Id.*

*Balfour Beatty Constr., Inc. v. Colonial Ornamental Iron Works, Inc.*, 986 F. Supp. 82, 84 (D. Conn. 1997), also contained the same language concerning the surety's obligations. In *Balfour*, the obligee allowed the disappointing contractor to complete the work in untimely fashion before it sought recovery from the surety. *Balfour*, 986 F. Supp. at 85-86. Summary judgment was granted to the surety because the obligee's actions "deni[ed] the [surety] the opportunity to exercise any of its options under the performance bond." *Id.* at 86; *see also St. Paul Fire & Marine*, 93 F. Supp. 2d at 1178 (granting surety's motion for summary judgment because obligee's actions "divest[ed] [the surety] of its ability to minimize its liability by selecting the lowest cost option and

by directing the construction or participating in the contractor selection process"); *Seaboard Sur. Co. v. Town of Greenfield*, 266 F. Supp. 2d 189, 198 (D. Mass. 2003) (actions prohibiting surety to exercise performance options rendered performance bond null and void); *Dragon Const., Inc. v. Parkway Bank & Trust*, 678 N.E. 2d 55, 58 (Ill. 1st Dist. 1997) (finding performance bond null and void because the surety "was stripped of its contractual right to minimize its liability under the performance bond by ensuring that the lowest responsible bidder was selected to complete the job" where obligee hired a replacement contractor without notice to the surety); *Ins. Co. of N. Am. v. Metro. Dade County*, 705 So. 2d 33, 34-35 (Fla. Dist. Ct. App. 1997) (failure of obligee to comply with performance "bond's notice provisions stripped the surety of its bargained for right and relieved the surety of its liability").

　　　　The Sureties rely on these precedents to argue that Hunt's failure to notify them of NWC's delays until long after they could have exercised their options under the performance bond similarly renders the bond null and void.  They contend, "more than nine (9) months after Hunt first claims NWC's performance was deficient and delaying the Project, more than five (5) months after it accelerated Rapid to overcome that alleged delay, and more than three (3) months after NWC completed the mass excavation work, Hunt decided to declare NWC in default and call on the Sureties to perform under the performance bond."  Sureties' Mem. at 14.

　　　　Hunt is not ignorant of this accumulated law of sureties.  Instead, it relies on a case from the Washington (State) Supreme Court, which recently held that a surety's liability is not conditioned on a declaration of default.  *Colorado Structures*, *Inc. v. Ins. Co. of the W.*, 167 P.3d 1125 (Wash. 2007).  In *Colorado Structures,* the subcontractor failed to perform on a timely basis,

was declared in default only when it had substantially completed its work,[2] and the obligee then sued

the surety under the performance bond for its losses.  *Colorado Structures*, 167 P.3d at 1129.  In

interpreting the bond language, the Washington Supreme Court added designations to identify the

paragraphs as "A" through "E," which it then read as follows:

> [**A**] Action Excavating & Paving, Inc. . . . hereinafter called
> Principal, and Insurance Company of the West . . .,
> hereinafter called Surety, are held and firmly bound under
> CSI Construction Co. . . ., hereinafter called Obligee, in the
> amount of . . . $472,290 . . .

> [**B**] WHEREAS, Principal has . . . entered into a subcontract
> with Obligee . . ., which subcontract is by reference made a
> part hereof, and is hereinafter referred to as the subcontract,
> NOW THEREFORE, THE CONDITION OF THIS
> OBLIGATION IS SUCH THAT, if Principal shall promptly
> and faithfully perform said subcontract, then this obligation
> shall be null and void; otherwise it shall remain in full force
> and effect.

> [**C**] Whenever Principal shall be, and declared by Obligee to
> be in default under the subcontract, the Obligee having
> performed Obligee's obligations thereunder:
> (1) Surety may promptly remedy the default, subject to the
> provisions of paragraph 3 herein, or;
> (2) Obligee after reasonable notice to Surety may, or Surety
> upon demand of Obligee may arrange for the performance
> of Principal's obligation under the subcontract subject to the
> provisions of paragraph 3 herein;
> (3) The balance of the subcontract price, as defined below
> shall be credited against the reasonable cost of completing
> performance of the subcontract. . . .[3]

---

[2]  Hunt argues that it declared NWC in default after NWC had completed the mass
excavation but not before NWC had substantially completed all of its work.  In other papers than
these motions, NWC presents evidence to the contrary.  For purposes of deciding the Sureties'
motions for summary judgment, the dispute is irrelevant.

[3]  The rest of the provision is omitted as irrelevant to the analysis.

*Id.* at 1130-1131.

The *Colorado Structures* court read paragraph "A" of the bond to make the surety immediately liable to the obligee. *Id.* at 1131. "By its plain terms, Paragraph B conditions the liability created in Paragraph A on one – and only one – express condition subsequent. Paragraph B states that 'the condition of this obligation is such that, if [the] Principal shall promptly and faithfully perform said subcontract, then this obligation shall be null and void; otherwise it shall remain in full force and effect.'" *Id.* at 1132. The Court reasoned:

> By using the word "condition" in its singular form, Paragraph B manifests that the liability created by Paragraph A is subject to only one condition – that the principal "promptly and faithfully perform" the offsite subcontract. By using the word "otherwise," . . . Paragraph B expressly eliminates all other conditions. Read together, Paragraphs A and B state that the surety's obligation commences when it executes the bond and continues until the principal promptly and faithfully performs.

*Id.* Finally, the Washington Supreme Court concluded:

> The preamble to Paragraph C sets forth three events (the principal's default, the obligee's declaration of default, and the obligee's performance) that constitute conditions precedent to the use of the remedies and damages described in Paragraph C, *but not* conditions precedent to the liability created in Paragraph A. [The surety's] liability on the bond was not conditioned on a declaration of default, and [the obligee's] failure to make such a declaration did not relieve [the surety] of its duty to pay on the bond.

*Id.* at 133 (in original).[4]   Distinguishing the precedents upon which the Sureties rely here, the

---

[4] Hunt notes that the *Colorado Structures* court found Paragraph C unambiguous. *Id.* at 1133 n.42. It argues that if there is any ambiguity, the Performance Bond at issue here should be construed against the Sureties, who are its beneficiaries. *Goldberg, Marchesano, Kohlman, Inc.*, 727 A.2d at 861.

*Colorado Structures* court found:

> The linchpin of the *L&A [Contracting v. S. Concrete Servs.*, 17 F.3d 106 (5th Cir. 1994)] court's conclusion is its assertion . . . that the events described in the preamble to Paragraph C condition not just the use of the remedies described in Paragraph C, but also to the *liability* described in Paragraph A.  To so hold, however, plainly violates the language of the bond.  As already discussed, Paragraphs A and B of the bond create liability, subject to a single express condition subsequent (the principal's prompt and faithful performance).  By using the word "otherwise," Paragraph B explicitly eliminates any other conditions on liability. Paragraph C imposes express conditions precedent (including that the principal be "in default" and that the obligee have declared the principal in default) on the use of the remedies described therein, but not on the liability described in Paragraphs A and B.  Believing that *L&A* was wrongly decided, we decline to follow it . . . .

*Id.* at 1134.  Other courts have reached basically the same conclusion.  *See Walter Concrete Constr. Corp. v. Lederle Labs*, 788 N.E.2d 609, 610 (N.Y. 2003); *Menorah Nursing Home, Inc. v. Zukov*, 153 A.D.2d 13 (N.Y. App. Div. 2d Dept. 1989); *Aetna Cas. & Sur. Co. v. Manshul Constr. Corp.*, No. 95-3994, No. 97-5266, 1999 WL 717257 (S.D.N.Y. Sept. 15, 1999).

This Court respectfully declines to adopt the reasoning of *Colorado Structures*, as it would turn a performance surety into a commercial guarantor – an undertaking well beyond the limits of the surety bond.  Rendering a "surety" absolutely liable for all costs and expenses, without notice, under Paragraphs A and B would also read Paragraph C out of the performance bond, and allow an obligee to wait for indefinite periods before demanding "performance."  Indeed, that is what happened here: Hunt wrote to the Sureties and "hereby demand[ed] that United States Surety Company and XL Reinsurance America, Inc. *arrange for performance of* National Wrecking's obligations under the subcontract."  Sureties' Mem. Ex. 7 (USSC Notice of Default) (emphasis

added).  Only after this very telling language, by which Hunt acknowledged the scope of the

performance bond, did Hunt add that "Hunt looks to United States Surety Company and XL

Reinsurance America, Inc. to remedy National Wrecking's failures to perform," *id.*, as if the Sureties

were guarantors.

   The *Colorado Structures* court failed to appreciate the inter-relationships among the

subparagraphs it labeled A, B and C.  Sure enough, A and B "create liability, subject to a single

express condition subsequent (the principal's prompt and faithful performance)."  *Colorado*

*Structures*, 167 P. 3d at 1134.  Failing prompt and faithful performance by the principal, the surety

is bound to fulfill the principal's *performance* – by one of the options identified in paragraph C.

While paragraphs A and B are between three parties (the obligor, the obligee and the surety),

paragraph C specifies the relationship between only two: the obligee and the surety.  Under A&B

the surety is liable, but under C, the obligee must fulfill its obligations to access the surety's purse.

When an obligee fails to provide timely notice to a surety so it can exercise its options under

paragraph C, the obligee has breached the contract and the surety is without liability.[5]

   Hunt seeks to avoid this customary analysis by blaming NWC for hiding the fact that

it was months behind the mass excavation schedule.  Hunt claims that it could not give notice to the

Sureties in time to correct NWC's tardiness because Hunt, itself, did not know that NWC would not

complete the excavation until April.  Hunt states that it did not realize that NWC would be late until

early February 2004.  If so, Hunt was miserably inattentive to its own Project.  The record clearly

---

[5] The Court notes that other courts have declined to follow *Colorado Structures*.  *See*
*CC-Aventura, Inc. v. Weitz Co., LLC*, No. 06-21598, 2007 WL 2986371, at *2 (S.D. Fla. Oct. 3,
2007); *Memphis-Shelby County Airport Auth. v. Ill. Valley Paving Co.*, No. 01-3041, 2007 WL
2904539, at * 4-6 (W.D. Tenn. Oct. 10, 2007).

indicates that Hunt recognized it had a real scheduling problem sometime in mid-January, at the latest, since it accelerated the concrete work of Rapid. Rapid began on site on January 22, 2004.[6]

In any event, this is not the issue. As soon as Hunt knew that NWC would not complete the job on time, it had an obligation to decide whether to declare NWC in default and notify the Sureties (who might have done something to aid NWC in speeding up the work, whether by hiring more trucks, more workers, more oversight, or whatever, in its judgment, would assist the obligor). Hunt sat on its hands and let NWC finish the excavation on its own. Hunt thereafter sat on its hands and failed to declare NWC in default until mid-summer 2004, when NWC was long-since off site. Hunt even then sat on its hands and failed to assist the Sureties in their legitimate investigation. Again, Hunt sat on its hands and only "terminated" NWC in the fall of 2004. And, finally, Hunt sat on its hands by suing only NWC in January 2005 and not suing the Sureties until later in that year. Under the express terms of the Performance Bond and the law, Hunt was required to give the Sureties "reasonable notice" of NWC's default in order to trigger the Sureties' liability. Hunt failed to do so and, thus, never triggered that liability.

## IV.  CONCLUSION

Where the obligee fails to notify a surety of an obligor's default in a timely fashion, so that the surety can exercise its options under the controlling performance bond, the obligee renders the bond null and void. Since that is what happened here, Hunt cannot recover from the

---

[6] In separate briefing on motions for summary judgment between Hunt and NWC, Hunt "admits that it accelerated Rapid to overcome delays caused by NWC's performance of the mass excavation at the Project" and that, "due to NWC's lack of progress, at the time Rapid began its work on the Project, it was only able to access about one-third of the excavation." Hunt's Statement of Material Facts in Genuine Dispute [Dkt. #51] ¶¶ 17 & 18. Given Hunt's own description of the status of the work in January 2004, it is obvious that Hunt realized NWC's slow progress long before Feburary 2004.

Sureties.  Hunt's claims against the Sureties will be dismissed.  At the request of Plaintiff Hunt, and

in light of the non-opposition of the Defendants, the Court will issue an order pursuant to Federal

Civil Rule of Procedure 54(b) to allow the parties to appeal this final decision as to the Sureties in

this matter.  This issue is now ripe for appeal, and the case will be stayed pending resolution of the

appeal of the dismissal of the Sureties.  A memorializing order accompanies this Memorandum

Opinion.


_____/s/_____
ROSEMARY M. COLLYER
United States District Judge

DATE: April 8, 2008